Filed 1/13/14

<u>CERTIFIED FOR PARTIAL PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B244436 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA390587) |
| v. | |
| LUIS F. ROSALES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura F. Priver, Judge. Affirmed as modified with directions.

Heather L. Beugen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, parts III A-D and F 2 are not certified for publication. The remainder of the opinion is to be published.

# I. INTRODUCTION

A jury convicted defendant, Luis F. Rosales, of three counts of first degree robbery. (Pen. Code, §§211, 212.5, subd. (a)[1].) The jury further found firearm use allegations true as to each count. (12022.53, subd. (b).) The trial court found defendant had a prior juvenile adjudication of a serious felony within the meaning of sections 667, subdivisions (b) through (i) and 1170.12. Defendant was sentenced to 30 years in state prison. We modify the oral pronouncement of judgment with respect to court facilities and court operations assessments. We affirm the judgment as modified. We direct that the abstract of judgment be amended upon remittitur issuance.

# II. THE EVIDENCE

Defendant committed three robberies of hotel lobby front desk clerks. Defendant was arrested at the scene of the third robbery. His loaded semiautomatic firearm was recovered. The recovered gun was introduced in evidence at trial. Surveillance video from the robberies showed defendant using a gun.

Margaret Haynes was the victim of the first robbery, which was charged in count 2. Ms. Haynes testified that on November 2, 2011, defendant pointed a gun at her and demanded money. Ms. Haynes was scared because she thought defendant would shoot her. He was holding the gun in a way that she could see it the whole time. When asked what the firearm looked like, Ms. Haynes said, "[L]ike a gun maybe the kind a policeman would carry." Ms. Haynes was not certain the gun in evidence was the one defendant used. But she also could not say it was *not* the gun defendant pointed at her. Ms. Haynes identified defendant in a photographic lineup. She said, "That's the guy that robbed [me] . . . ." Ms. Haynes also identified defendant at trial.

---

[1] Further statutory references are to the Penal Code unless otherwise noted.

Erick Lopez was the victim of the second robbery, which was charged in count 3. On October 23, 2011, defendant pointed a gun at Mr. Lopez and demanded cash. Mr. Lopez was scared and nervous. Mr. Lopez did not know anything about guns. He did not know the difference between a revolver and a semiautomatic gun. But he had seen a gun with a cylinder in the front that revolves. Defendant's weapon was not that type. Mr. Lopez could not say for sure that the gun in evidence was the one defendant used. But Mr. Lopez testified the weapon looked like the gun pointed at him during the robbery. Mr. Lopez identified defendant in a photographic lineup as someone who looked like the suspect. Mr. Lopez identified defendant at trial.

Mohd Rahman was the victim of the third robbery, which was charged in count 1. The robbery occurred on November 2, 2011. At trial, Mr. Rahman identified defendant as the perpetrator. Defendant pointed a gun at Mr. Rahman and demanded money. Mr. Rahman was afraid. After Mr. Rahman complied, defendant began to walk away. However, two hotel guests stopped defendant and, following a struggle, detained him until police arrived. During the struggle, defendant said the person from whom he borrowed the gun would kill defendant if he did not return it. Mr. Rahman identified the gun in evidence as the one defendant used during the robbery.

## III. DISCUSSION

[Parts III A-D and F 2 are not to be published.]

### A. Inhabited Dwelling

Section 212.5, subdivision (a) states in part, "[E]very robbery which is perpetrated in an inhabited dwelling house . . . or the inhabited portion of any other building is robbery of the first degree." Defendant challenges the sufficiency of the evidence the robberies occurred in an inhabited dwelling house making them of the first degree. Given the undisputed facts, we resolve that question as a matter of law. (*People v. Cruz* (1996) 13 Cal.4th 764, 775; *People v. Villalobos* (2006) 145 Cal.App.4th 310, 317; see

3

*People v. Thorn* (2009) 176 Cal.App.4th 255, 261.) We conclude there was substantial evidence the robberies were first degree.

The terms "inhabited dwelling house" and "inhabited portion of any other building" are to be construed to effectuate the legislative purpose. (*People v. Cruz, supra,* 13 Cal.4th at p. 775; *People v. Thorn, supra,* 176 Cal.App.4th at p. 261.) Those terms are functionally equivalent. (*People v. O'Bryan* (1985) 37 Cal.3d 841, 844; *People v. Villalobos, supra,* 145 Cal.App.4th at p. 316, fn. 2.) The terms "inhabited dwelling house" and "inhabited portion of any other building" have the same meaning in both the robbery and burglary statutes. (*People v. Villalobos, supra,* 145 Cal.App.4th at p. 316; *People v. Long* (2010) 189 Cal.App.4th 826, 834; see § 460, subd. (a) [burglary].) Section 459, concerning burglary, states, "As used in this chapter, 'inhabited' means currently used for dwelling purposes, whether occupied or not." Our Supreme Court has held, "[T]he phrase 'inhabited dwelling house' is a broad, inclusive term." (*People v. Cruz, supra,* 13 Cal.4th at p. 768 [burglary]; *People v. Long, supra,* 189 Cal.App.4th at p. 834; *People v. Villalobos, supra,* 145 Cal.App.4th at p. 317.) It is broadly construed to effectuate the legislative purpose. (*People v. Cruz, supra,* 13 Cal.4th at p. 775; *People v. Thorn, supra,* 176 Cal.App.4th at p. 261.) So construed, it applies to hotel rooms. (*People v. Long, supra,* 189 Cal.App.4th at p. 838; *People v. Villalobos, supra,* 145 Cal.App.4th at pp. 315-321; *People v. Fleetwood* (1985) 171 Cal.App.3d 982, 986-988.) But the inhabited dwelling element of subdivision 459 also applies to hotel lobbies (*People v. Mendoza* (2004) 118 Cal.App.4th 571, 575; *People v. Wilson* (1989) 209 Cal.App.3d 451, 452-453).

That a hotel lobby is an "inhabited dwelling house" as the Court of Appeal held in *Wilson* is consistent with the legislative purpose. Historically, heightened protection has been afforded inhabited properties in the robbery context for two related reasons. (*People v. Cruz, supra,* 13 Cal.4th at p. 775; *People v. Villalobos, supra,* 145 Cal.App.4th at p. 317.) First, an inhabited dwelling as opposed to, for example, a commercial property, is a private sanctuary. (*People v. Cruz, supra,* 13 Cal.4th at p. 775; *People v. Villalobos, supra,* 145 Cal.App.4th at p. 317; see *People v. Woods* (1998) 65 Cal.App.4th

4

345, 349, 350.)  As our Supreme Court observed in *Cruz,* "[T]his term should be construed to effectuate the legislative purpose underlying the statute, namely to protect the peaceful occupation of one's residence." (*People v. Cruz, supra,* 13 Cal.4th at p. 775; accord, *People v. Villalobos, supra,* 145 Cal.App.4th at p. 317; *People v. Woods, supra,* 65 Cal.App.4th at pp. 349, 350.)  Second, the potential for violence is greater when a robbery occurs in an inhabited place.  A victim is more likely to react violently to an intrusion into an inhabited location because of the presence of others who may be harmed and personal property.  (*People v. Cruz, supra,* 13 Cal.4th at pp. 775-776; *People v. Villalobos, supra,* 145 Cal.App.4th at p. 317.)

Hotels are temporary private sanctuaries for guests.  They are places in which people reside for a time; to which they bring their personal property and, often, their loved ones.  That a hotel lobby is also a place of business does not change the character of the property as a whole as an inhabited dwelling.  Therefore, the present robberies occurred in "an inhabited dwelling house" and were of the first degree.  We need not address other scenarios where a robbery occurs in a lobby disconnected from rooms or places where guests congregate.

## B.  Personal Firearm Use

Defendant challenges the sufficiency of the evidence he used a firearm while committing the robberies charged in counts 2 and 3.  Defendant notes:  the victims could not say whether the weapon introduced in evidence was the one he used; neither a gun nor bullets were recovered at the scene of the count 2 and 3 robberies; the victims did not physically feel the firearm; and defendant never threatened to kill either hotel clerk.  The applicable standard of review is well-established:  "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *People v.*

5

*Jones* (2013) 57 Cal.4th 899, 960.) We conclude the evidence supported imposition of the enhancements.

A firearm does not have to be operable or loaded for the section 12022.53 enhancement to apply. (§ 12022.53, subd. (b); *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1124.) The Court of Appeal for the Third Appellate District set forth the applicable law in *People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1435-1436: "The fact that an object used by a robber was a 'firearm' can be established by direct or circumstantial evidence. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 11-12; *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 541; *People v. Dominguez* (1995) 38 Cal.App.4th 410, 421.) [¶] Most often, circumstantial evidence alone is used to prove the object was a firearm. This is so because when faced with what appears to be a gun, displayed with an explicit or implicit threat to use it, few victims have the composure and opportunity to closely examine the object; and in any event, victims often lack expertise to tell whether it is a real firearm or an imitation. And since the use of what appears to be a gun is such an effective way to persuade a person to part with personal property without the robber being caught in the act or soon thereafter, the object itself is usually not recovered by investigating officers. [¶] Circumstantial evidence alone is sufficient to support a finding that an object used by a robber was a firearm. (*People v. Green* (1985) 166 Cal.App.3d 514, 516–517, & fn. 1 [although the victim did not see the weapon, the fact that one of two culprits put a cold object to the victim's head after threatening to shoot her baby was sufficient circumstantial evidence that the culprit, later found with bullets in his pocket, personally used a firearm in robbing and raping the victim]; see also *People v. Maury* (2003) 30 Cal.4th 342, 396 [inferences drawn from circumstantial evidence are sufficient to support a conviction]; *People v. Bloom* (1989) 48 Cal.3d 1194, 1208 ['circumstantial evidence is as sufficient as direct evidence to support a conviction'].)"

Our Third Appellate District colleagues applied the foregoing law to the facts of the case before it: "Here, defendant demanded of the female victim, 'Bitch, give me your purse,' then pulled up his shirt and displayed the handle of a black pistol tucked in his waistband. The victim, who had seen guns before but had never handled one, testified

6

she immediately saw that the pistol looked like a gun, and it made her scared. She 'assumed' the pistol was 'real' and handed over her pocketbook. When asked by defendant's trial attorney what the pistol was made of, the victim said: 'Probably metal because—I don't know. Wasn't wood, wasn't plastic. I don't know if it was plastic or metal . . . . He don't show it to me. He just do 'this' to me [pulled up his shirt and displayed the pistol].' The victim then conceded that she could not say for certain whether it was 'a toy or real or not.' [¶] The jury was not required to give defendant the benefit of the victim's inability to say conclusively the pistol was a real firearm. This is so because 'defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a [firearm].' (*People v. Rodriguez, supra,* 20 Cal.4th at p. 13.) Indeed, even though for purposes of section 12022.53, subdivision (b), a firearm need not be loaded or even operable, 'words and actions, in both verbally threatening and in displaying and aiming [a] gun at others, [can] fully support[ ] the jury's determination the gun was sufficiently operable [and loaded].' (*People v. Lochtefeld, supra,* 77 Cal.App.4th at p. 541.) Accordingly, jurors 'may draw an inference from the circumstances surrounding the robbery that the gun was not a toy.' (*People v. Aranda* (1965) 63 Cal.2d 518, 533 . . . .)" (*People v. Monjaras, supra*, 164 Cal.App.4th at pp. 1436-1437.)

The Court of Appeal concluded: "Simply stated, when as here a defendant commits a robbery by displaying an object that looks like a gun, the object's appearance and the defendant's conduct and words in using it may constitute sufficient circumstantial evidence to support a finding that it was a firearm within the meaning of section 12022.53, subdivision (b). In other words, the victim's inability to say conclusively that the gun was real and not a toy does not create a reasonable doubt, as a matter of law, that the gun was a firearm. (See [*People v.*] *Aranda, supra,* 63 Cal.2d at pp. 532–533 ['Testimony by witnesses who state that they saw what looked like a gun, even if they cannot identify the type or caliber, will suffice' to prove 'the gun was not a toy'].)" (*People v. Monjaras, supra*, 164 Cal.App.4th at pp. 1437-1438, fn. omitted; accord,

7

*People v. Law* (2011) 195 Cal.App.4th 976, 978-979, 982-984.) We agree with the foregoing analysis.

In the present case, Mr. Rahman, Mr. Hayes and Ms. Lopez all testified defendant used a gun. Defendant pointed a gun at each of the victims and demanded money. The victims were frightened when defendant pointed his weapon at them. Mr. Rahman identified the gun recovered after the third robbery and introduced in evidence at trial as the firearm defendant used. The remaining two victims could not say that the gun in evidence was in fact the one defendant used. They testified, however, the gun was consistent with the weapon they saw. Further, video surveillance tape from the hotel lobbies showed defendant using a gun. Moreover, the jury could reasonably conclude the firearm recovered in the third robbery was the same one defendant used in the first two. This was substantial evidence defendant personally used a firearm in the commission of the robberies charged in counts 2 and 3 within the meaning of section 12022.53, subdivision (b).

## C. Pro Per Request

Defendant asserts he was denied his right of self-representation in violation of the Sixth Amendment to the United States Constitution. The trial court found defendant was simply seeking to delay the trial. Our review is for an abuse of discretion. (*People v. Marshall* (1996) 13 Cal.4th 799, 827; *People v. Windham* (1977) 19 Cal.3d 121, 127-128.) We find no abuse of discretion.

Defendant was arraigned on February 9, 2012. As of June 4, 2012, the prosecutor had offered a proposed disposition. On June 4, defendant was represented by Carlos Bido, a deputy public defender. On that date defendant made a motion to have Mr. Bido relieved as counsel. Following a hearing, the trial court denied the substitution of counsel motion. Defendant continued to object to going to trial while represented by Mr. Bido. Mr. Bido, however, declared he would be ready for trial within 30 days. Ultimately, defendant agreed to waive time for trial. The case was continued for pretrial hearing to

8

June 25, 2012, and then, at Mr. Bido's request, to July 30, 2012. On July 30, 2012, Mr. Bido advised the trial court, "Mr. Rosales is requesting a continuance to discuss this case further with his family." The request was denied. The trial court offered to trail the matter so defendant could confer with his relatives. Defendant objected: ". . . I'm not ready to take anything to trial. And you know that. I'm telling you." The trial court trailed the matter to August 16, 2012, as day 17 of the 20 days in which to commence trial pursuant to the prior time waiver. Mr. Bido said, "I'll be absolutely ready on that day." The trial court continued the case to August 16, 2012, and ordered that trial commence by August 20, 2012.

At the outset of the August 16, 2012 hearing, Mr. Bido stated, "Mr. Rosales is requesting a continuance for about 40 days, so that he can speak to his family about how he should resolve this case." Mr. Bido noted, however, "The People as well as myself would prefer picking a jury on Monday [August 20]." When the trial court advised defendant he would not get more time, he said he needed time to find a private attorney. The trial court advised: "This case has been in this court since February, okay. You've had plenty of time to talk to your family. You've had plenty of time to hire a private lawyer. I told you when we were here on the 25th, when I continued the case to July 30, that there weren't going to be any more continuances. That was two months ago, okay. This case is not that complicated of a case. I understand it is the most important thing going on in your life, and Mr. Bido did a fine job for you. But I'm not going to continue this case other than continue the case until Monday. [¶] I'll tell you what I'll do. I'll continue the case to Monday as seven of 10. If you have another lawyer here, private lawyer in here on Monday, hired, ready to go, I would grant a continuance, okay. But otherwise, Mr. Bido is your lawyer. The case goes to 100 on Tuesday, and jury selection begins. Do you want to do that, or do you want the trial to begin tomorrow? Those are your two choices." Faced with those options, defendant stated: "I would rather go pro per. I would rather defend my own self." The trial court denied defendant's self-representation motion on the ground it was made for the sole purpose of delay. Defendant then agreed to commence trial within three days of Monday, August 20, 2012.

9

The trial court advised defendant: "So Mr. Rosales, if you have another lawyer hired and coming in here or at least calls us on Monday and says that he's been retained and can't come in on Monday because he has a calendar conflict, I'll grant the continuance; otherwise, this case is going into 100 on Tuesday, August 21. Or you can accept the People's offer or my offer. So we'll see you Monday. Good luck, sir." Defendant did not hire private counsel.

We find no abuse of discretion. Defendant repeatedly sought to delay the trial without stating sufficient reason for doing so. He had ample time to consider the plea offer, consult with his family or hire private counsel. Mr. Bido was prepared to proceed. Defendant's request came three days prior to the scheduled start of trial. There was no evidence any failure to delay the trial would prejudice defendant. Under these circumstances, the trial court could reasonably conclude defendant sought solely to delay his trial. (See *People v. Windham, supra,* 19 Cal.3d at pp. 127-129; *People v. Powell* (2011) 194 Cal.App.4th 1268, 1278-1279; *People v. Bradford* (2010) 187 Cal.App.4th 1345, 1353-1354.) Finally, we note that the United States Supreme Court has never held that a pro se request made so close to the date of trial is timely. (*Moore v. Calderon* (9th Cir. 1997) 108 F.3d 261, 264-265 [abrogated on other grounds by *Williams v. Taylor* (2000) 529 U.S. 362, 404-409, as noted in *Baker v. City of Blaine* (9th Cir. 2000) 221 F.3d 1108, 1110, fn. 2]; *People v. Rudd* (1998) 63 Cal.App.4th 620, 626-630.) Under controlling United States Supreme Court authority, no Sixth Amendment violation occurred.

### D. The Prior Juvenile Adjudication

Defendant contends using his prior juvenile adjudication to enhance his sentence under sections 667, subdivisions (b) through (i) and 1170.12 violated his Sixth Amendment rights. That contention is without merit. (*People v. Nguyen* (2009) 46 Cal.4th 1007, 1010-1012, 1014-1028; see *People v. Quiles* (2009) 177 Cal.App.4th 612, 620-621.) We are bound by California Supreme Court precedent. (*People v. Johnson*

10

(2012) 53 Cal.4th 519, 527-528; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

[Parts E and F 1 are to be published]

E.  CALCRIM No. 359

We asked the parties to brief the question whether it was error to instruct the jury on corpus delicti pursuant to CALCRIM No. 359.  Here the jury was instructed pursuant to CALCRIM No. 359:  "The defendant may not be convicted of any crime based on his out-of-court statement alone.  You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime was committed.  [¶]  That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed.  [¶]  The identity of the person who committed the crime and the degree of the crime may be proved by the defendant's statement alone.  [¶]  You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt."  Defendant asserts CALCRIM No. 359 should not have been given.  Defendant relies on *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1427-1429.  *Rivas* held CALCRIM No. 359 is confusing and should be reconsidered.  We disagree with *Rivas* and find no instructional error.

In *People v. Rivas, supra,* 214 Cal.App.4th at page 1428, the Court of Appeal held the first two paragraphs of CALCRIM No. 359 correctly state the corpus delicti rule.  The court took issue, however, with the third paragraph. The Court of Appeal held:  "[T]he reference to identity in CALCRIM No. 359 presents a risk of confounding the jury by telling jurors that a defendant's inculpatory extrajudicial statements, taken alone, do not suffice to allow the jury to convict the defendant of a charged crime—and yet those statements, again taken alone, are entertainable to prove the defendant's 'identity [as] the person who committed the crime' (CALJIC No. 359, 3d par.), which to any juror can

11

only mean the defendant's identity as the perpetrator, i.e., the guilty party. The instruction requires reconsideration." (*Id.* at p. 1429, fn. omitted.)

The Court of Appeal noted the Supreme Court upheld a similar instruction, CALJIC No. 2.72, in *People v. Foster* (2010) 50 Cal.4th 1301, 1344-1345, and footnote 19. The Court of Appeal held: "We are not here concerned with CALJIC No. 2.72, whose validity was upheld in *Foster*, *supra*, 50 Cal.4th at page 1345. The wording of CALJIC No. 2.72 is quite different; the version considered in *Foster* provided: '"No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any admission made by him outside of this trial. [¶] The identity of the person who is alleged to have committed a crime is not an element of the crime nor is the degree of the crime. Such identity or degree of the crime may be established by an admission."' (*Foster*, *supra*, at pp. 1344-1345, fn. 19, italics omitted.) CALJIC No. 2.72 explains the role of identity satisfactorily, i.e., that an individual's identity is not an element of a crime (*Foster*, *supra*, at p. 1345), but CALCRIM No. 359 does not. As Carrillo argues in a supplemental letter brief this court requested, 'It may well be that in the third paragraph of CALCRIM [No.] 359 the drafters intended simply to convey the idea that identity is not part of the corpus delicti rule which requires corroboration. But they did so in a most unfortunate way.'" (*People v. Rivas, supra,* 214 Cal.App.4th at p. 1429, fn. 8.) Ultimately, in *Rivas,* the Court of Appeal concluded the instructional error was harmless. (*Id.* at pp. 1429-1430.) Other than the harmless error discussion, defendant adopts the foregoing analysis in *Rivas*.

We respectfully disagree with defendant's assertion that CALCRIM No. 359 incorrectly states California law. We review CALCRIM No. 359 to determine whether it correctly states the law. (*People v. Bland* (2002) 28 Cal.4th 313, 332; *People v. Kelly* (1992) 1 Cal.4th 495, 525.) We consider the specific language and the instruction in the context in which it was given. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248; *People v. Kelly, supra,* 1 Cal.4th at pp. 525-526.) Our Supreme Court has explained: "'When we review challenges to a jury instruction as being incorrect or incomplete, we evaluate the instructions given as a whole and not in isolation. [Citation.]'" (*People v.*

12

*Moore* (2011) 51 Cal.4th 1104, 1140, quoting *People v. Rundle* (2008) 43 Cal.4th 76, 149, overruled on a different point in *People v. Doolin* (2009) 45 Cal.4th. 390, 421, fn. 22.)  We ask whether there is any reasonable likelihood the jury was confused and misapplied the instruction.  (*People v. Bland, supra,* 28 Cal.4th at p. 332; *People v. Harrison* (2005) 35 Cal.4th 208, 252; *People v. Kelly, supra,* 1 Cal.4th at p. 525.)

It is well-established that some evidence independent of a defendant's out-of-court confession or admission must be introduced to show that a crime was committed by someone.  (*People v. Ledesma* (2006) 39 Cal.4th 641, 721; *People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169.)  As our Supreme Court explained in *Alvarez*: "In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause.  In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant.  [Citations.]" (*Id.* at pp. 1168-1169; see *People v. Jablonski* (2006) 37 Cal.4th 774, 825.)  In *People v. Ledesma, supra,* 39 Cal.4th at page 721, our Supreme Court explained the purpose of the rule: "The principal purpose of the corpus delicti rule is to ensure that a defendant is not convicted of a crime that never occurred. (*People v. Carpenter* (1997) 15 Cal.4th 312, 394 [superseded by statute on another ground as noted in *People v. Friend* (2009) 47 Cal.4th 1, 87]; see *People v. Jennings* [(1991)] 53 Cal.3d 334, 368.)  That purpose is fulfilled by the admission of evidence sufficient to establish that the crime occurred." (Accord, *People v. Foster*, *supra*, 50 Cal.4th at pp. 1344-1346.)  It is also well-established that a defendant's inculpatory out-of-court statements *may*, however, be relied upon to establish his or her identify as the perpetrator of a crime.  (*People v. Howard* (2010) 51 Cal.4th 15, 36-37; *People v. Ledesma, supra,* 39 Cal.4th at p. 721.)  This is because the perpetrator's identity is not part of the corpus delicti.  (*People v. Valencia* (2008) 43 Cal.4th 268, 297; *People v. Ledesma, supra,* 39 Cal.4th at p. 721; *People v. Wright* (1990) 52 Cal.3d 367, 404, overruled on a different point in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

CALCRIM No. 359, like CALJIC No. 2.72, clearly so states. The corpus delicti rule is stated in the first two paragraphs of CALCRIM No. 359. The law concerning proof of identity by a defendant's extrajudicial statements is correctly stated in the third paragraph. There is no danger a jury will be unable to separate the two rules any more than in CALJIC No. 272 which has been approved by our Supreme Court in *Foster*. As noted, CALJIC No. 2.72 states in part: "The identity of the person who is alleged to have committed a crime is not an element of the crime [nor is the degree of the crime]. The identity [or degree of the crime] may be established by [a] [an] [confession] [or] [admission]." CALCRIM No. 359 states with greater precision and economy of language, "The identity of the person who committed the crime [and the degree of the crime] may be proved by the defendant's statement[s] alone." CALCRIM No. 359 correctly states the law. (Cf. *People v. Foster, supra,* 50 Cal.4th at pp. 1344-1345; *People v. Ledesma, supra,* 39 Cal.4th at p. 721.) There was no reasonable likelihood the jury was confused and misapplied the instruction. Finally, CALCRIM No. 359 reminds the jury that the accused may not be convicted unless the prosecution proves guilt beyond a reasonable doubt. CALJIC No. 2.72, which was approved by our Supreme Court in *Foster*, contains no such reminder.

Here, in any event, any error would have been harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24*; People v. Watson* (1956) 46 Cal.2d 818, 836.) Defendant's only extrajudicial statement was that he would be killed if the gun was not returned to its owner. This extrajudicial statement was made while defendant was wrestled to the ground by two hotel guests on November 2, 2011. There was overwhelming evidence defendant was the man who committed the robberies. He was positively identified by persons present at all three robberies. Videos of all three robberies were shown to the jury.

14

## F. Sentencing Errors

### 1. Presentence conduct credit

The trial court gave defendant 337 days of credit for time actually served in custody prior to the imposition of judgment. The trial court also gave defendant 50 days of conduct credit pursuant to section 2933.1, subdivision (c). We asked the parties to address the effect of the October 1, 2011 amendments to section 4019 on presentence conduct credit awards. (Stats. 2011, ch. 15, § 482.) These amendments were part of the 2011 Realignment Legislation addressing public safety.

The present provisions of section 4019, subdivisions (b), (c) and (f) grant an accused four days of conduct credit for every four days actually served. Section 4019, as effective October 1, 2011, makes no reference to the more restrictive grant of presentence conduct credits in section 2933.1, subdivision (c) which states: "Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail, industrial farm, or road camp, or a city jail, industrial farm, or road camp, following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)." Section 2933.1, subdivision (c) limits presentence conduct credits to 15 percent in cases where the defendant is convicted of a violent felony within the meaning of section 667.5, subdivision (c). Robbery is a violent felony. (§ 667.5, subd. (c)(9); *In re Coley* (2012) 55 Cal.4th 524, 531.) In addition, any offense in which the accused uses a firearm within the meaning of section 12022.53 is a violent felony. (§ 667.5, subd. (c)(22); *People v. Robinson* (2012) 208 Cal.App.4th 232, 256.) Both of these definitional provisions of a violent felony, section 667.5, subdivisions (c)(9) and (22), apply to defendant who used a firearm during the robberies.

The October 1, 2011 adoption of section 4019, subdivisions (b), (c) and (f) was not intended to repeal the less generous presentence conduct provisions of section 2933.1,

15

subdivision (c). Section 4019 makes no reference to section 2933.1, subdivision (c). Therefore, any repeal necessarily would have been by implication. Repeals by implication are disfavored. (*People v. Siko* (1988) 45 Cal.3d 820, 824 ["As a general rule of statutory construction, of course, repeal by implication is disfavored."]; *Flores v. Workmen's Comp. Appeals Bd.* (1974) 11 Cal.3d 171, 176 ["[A]ll presumptions are against a repeal by implication."].) Our Supreme Court has explained: "Absent an express declaration of legislative intent, we will find an implied repeal 'only when there is no rational basis for harmonizing the two potentially conflicting statutes [citation], and the statutes are 'irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation.'" (*Garcia v. McCutcheon* (1997) 16 Cal.4th 469, 476-477, quoting *In re White* (1969) 1 Cal.3d 207, 212.)

First, there is a rational basis for harmonizing sections 4019, subdivisions (b), (c) and (f) and 2933.1, subdivision (c). Violent felonies are more serious and logically warrant greater periods of incarceration. Nonviolent felonies, some which result in county jail sentences pursuant to section 1170, subdivision (h)(2) and involve less serious crimes, result in greater credits. Second, the two presentence conduct credits provisions are not irreconcilable, clearly repugnant and so inconsistent that the two cannot operate concurrently. There are two distinct presentence conduct credits at issue here. The first is for offenders who do not commit violent felonies. The second is for offenders who commit violent felonies. These two sentencing schemes operate concurrently depending on whether the offense is specified in section 667.5, subdivision (c). (We need not discuss section 2933.2, subdivision (c) which prohibits presentence credits for murderers.) Thus, section 2933.1, subdivision (c) has not been expressly or impliedly repealed. The trial court correctly gave defendant only 50 days of conduct credit.

16

[The following portion of the opinion, part F 2, is deleted from publication.]


2.  Other errors


The trial court failed to orally impose a $30 court facilities assessment (Gov. Code, § 70373, subd. (a)(1)) and a $40 court operations assessment (§ 1465.8, subd. (a)(1)) *as to each count*.  The oral pronouncement of judgment must be modified to so provide.  (*People v. Sencion* (2012) 211 Cal.App.4th 480, 484-485; *People v. Castillo* (2010) 182 Cal.App.4th 1410, 1415, fn. 3.)  The abstract of judgment is correct in this regard.

The trial court imposed a $10 local crime prevention programs fine (§ 1202.5, subd. (a)) plus penalty assessments.  The abstract of judgment reflects $31 in penalty assessments.  Correctly calculated, however, the penalty assessments total $28:  a $10 state penalty (§ 1464, subd. (a)(1)); a $7 county penalty (Gov. Code, § 76000, subd. (a)(1)); a $2 state surcharge (§ 1465.7, subd. (a)); a $3 state court construction penalty (Gov. Code, § 70372, subd. (a)(1)); a $1 deoxyribonucleic acid penalty (Gov. Code, § 76104.6, subd. (a)(1)); a $3 state-only deoxyribonucleic acid penalty (Gov. Code, § 76104.7, subd. (a)); and a $2 emergency medical services penalty.  (Gov. Code, § 76000.5, subd. (a)(1).)  The abstract of judgment must be amended to so expressly provide.

17

[The balance of the opinion is to be published]

## IV.  DISPOSITION

The oral pronouncement of judgment is modified to impose a $30 court facilities assessment and a $40 court operations assessment as to each count.  (Gov. Code, § 70373, subd. (a); § 1465.8, subd. (a)(1).  The abstract of judgment must also be amended to reflect $28 in penalty assessments on the $10 local crime prevention programs fine as set forth in part III F 2 of this opinion.  (Pen. Code, § 1202.5, subd. (a).)  In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

TURNER, P. J.

I concur:

KRIEGLER, J.

18

The People v. Luis F. Rosales

B244436


MOSK, J., concurring and dissenting


I dissent in part and concur in part.

To consider a hotel lobby open to the public as an "inhabited dwelling house" for purposes of Penal Code section 212.5, subdivision (a) expands the meaning of the term beyond the Legislature's intent. The purpose of section 212.5—to provide "heightened protection to the residence" (*People v. Cruz* (1996) 13 Cal.4th 764, 775)—is based on factors unique to a residence or living quarters, including "to protect the peaceful occupation of one's residence,"[1] that a person is more likely to react violently to a crime in a residence or living quarters (*ibid.*), and victims within a confined dwelling space are more vulnerable. (See *People v. Fleetwood* (1985) 171 Cal.App.3d 982, 987.)

I acknowledge that any space inside a hotel literally could be said to be within an inhabited dwelling. But, under the majority decision, the shops or ballrooms in major hotels would be considered part of an inhabited dwelling and therefore covered by Penal Code section 212.5, subdivision (a). These days, many structures have mixed uses. The top floors of buildings are often composed of condominiums, hotel rooms, or apartments, while the bottom floor or floors contain stores, offices, markets, and restaurants, all of which are "integral part[s] of the building" (*People v. Wilson* (1989) 209 Cal.App.3d 451, 453) and thus under the majority decision would be considered part of an inhabited dwelling within the meaning of Penal Code section 212.5, subdivision (a). Such an application of the statute would have nothing to do with its intent. Any member of the public can enter a hotel lobby—not just those who are staying at the hotel. That open

---

[1] "For a man's house is his castle, *er domus sua cuique tutissimum refugium.*" (Fn. omitted), Sir Edward Coke quoted in Bartlett, Familiar Quotations (16th ed. 1992) 152; 3 Wharton's Criminal Law (15th ed. 2013) § 325 ["Burglary has always been regarded as a serious crime because of the ancient notion that a man's home is his castle. When he closes his door, he should be able to feel secure in his castle"].

access is different than a laundry room or garage in an apartment (*People v. Woods* (1998) 65 Cal.App.4th 345, 348-350), which areas are extensions of the living quarters and not generally open to the public.

"[T]he 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose . . . ." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)  I believe the holdings in this case and *People v. Wilson*, *supra*, 209 Cal.App.3d 451 are not only an overly expansive application of the statute, but can lead to unintended and absurd results.  For those reasons, I respectfully dissent to the application of Penal Code section 212.5, subdivision (a) to the facts of this case.  Otherwise I concur.


MOSK, J.